**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-1786
_____

GENNADIY NEKRILOV; EUGENE NEKRILOV; KWAN
HO TANG;
JAYU JEN; ALAN SUEN
Appellants

v.

CITY OF JERSEY CITY

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 2-19-cv-22182)
District Judge:  Honorable Kevin McNulty

_____

Argued:  November 18, 2021
_____

Before:  CHAGARES, <u>Chief</u> Judge, BIBAS and FUENTES,
<u>Circuit</u> <u>Judges</u>

(Filed: August 16, 2022)

_____

Joseph Tripodi
James M. Van Splinter [ARGUED]
Kranjac Tripodi & Partners
30 Wall Street
12th Floor
New York, NY 10005

      <u>Counsel for Appellant</u>

Philip S. Adelman
Stevie D. Chambers [ARGUED]
Jersey City Law Department
280 Grove Street
City Hall
Jersey City, NJ 07302

      <u>Counsel for Appellee</u>

_____

OPINION OF THE COURT

_____

CHAGARES, <u>Chief</u> <u>Judge</u>.

Gennadiy and Eugene Nekrilov, Kwan Ho Tang, Jayu Jen, and Alan Suen (together, the "plaintiffs") filed this lawsuit under 42 U.S.C. § 1983 challenging a Jersey City ordinance curtailing the ability of property owners and lease holders to operate short-term rentals. The plaintiffs alleged that, having passed an earlier zoning ordinance legalizing short-term rentals

in Jersey City (the "City"), which enticed them to invest in properties and long-term leases, the City violated their constitutional rights under the Takings Clause of the Fifth Amendment, the Contract Clause of Article I, and the Due Process Clauses of the Fifth and Fourteenth Amendments by passing the new ordinance. The new ordinance, they allege, undermined their legitimate, investment-backed expectations and injured their short-term rental businesses. The plaintiffs also moved for a preliminary injunction against the enforcement of the new ordinance. The City moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The District Court granted the motion, dismissed the complaint with prejudice, and denied the preliminary injunction motion as moot. For the reasons that follow, we will affirm the judgment of the District Court.

I.

The plaintiffs are individuals who invest in and operate short-term rentals in Jersey City using online home-sharing platforms. Home-sharing platforms, such as Airbnb, provide a residential alternative to traditional hotels for travelers seeking to rent a spare room or property on a nightly, weekly, or monthly basis.

Steven Fulop was elected Mayor of Jersey City in 2013.[1] One of Mayor Fulop's priorities was to incentivize investment and development in Jersey City. As a part of that effort, in 2015, Mayor Fulop supported the passage of a zoning ordinance, Ordinance 15.137, that affirmatively legalized

---

[1] At all relevant times, Fulop was Mayor of Jersey City.

short-term rentals in Jersey City. Ordinance 15.137 was the first of its kind in the state of New Jersey.

Ordinance 15.137 provided, in relevant part:

1. Short Term Rentals are permitted as an accessory use to a permitted principal residential use in all zoning districts and redevelopment plan areas where residential uses are permitted.

    a. The person offering a Dwelling Unit for Short-Term Rental use must be the owner or lessee of the residence in which the Short-Term Rental activity occurs. Short-Term Rental activity may occur in a habitable accessory building located on the same premises as the residence.

    b. No person offering a Dwelling Unit for Short-Term Rental use shall be required to obtain any license for such use . . . unless such person offers more than 5 separate Dwelling Units for Short-Term Rental use in the City. Any person offering more than 5 separate Dwelling Units for Short-Term Rental use in the City must:

        i. obtain a license pursuant to Section 254-82 to offer each Dwelling Unit for Short-Term Rental . . . .

        ii. ensure that the Short-Term Rental use is clearly

4

incidental to the principal residential uses permitted in the zone where each such Dwelling United is located . . . .

Appendix ("App.") 161–62. Ordinance 15.137 also mandated that short-term uses of residential properties "shall be conducted in a manner that does not materially disrupt the residential character of the neighborhood." App. 162.

Jersey City issued a press release outlining the goals of the proposed ordinance. The press release explained that although the ordinance would "allow[] residents to rent homes for less than 30 days," it also "include[d] several commonsense protections" that would prevent short-term rental operators from "changing the character of the neighborhood." App. 167 (quotation marks omitted). To prevent the formation of informal "Airbnb hotels," the ordinance would also limit the number of properties one user could rent to five.

Mayor Fulop was quoted in the press release and made other public statements in support of the ordinance, describing companies that participate in the "sharing economy" as the "future." App. 102. He also authored an article in the Huffington Post explaining the purposes and benefits of the ordinance. Mayor Fulop noted that home-sharing platforms allow "middle-class folks [to] earn a bit of extra income by renting out their apartments." Id. The ordinance had the support of other Jersey City public officials, several of whom made statements in support of the ordinance. The Jersey City Council unanimously approved the ordinance, and on October 30, 2015, Mayor Fulop signed the ordinance into law.

5

Following the passage of Ordinance 15.137, Mayor Fulop's relationship with Airbnb purportedly began to deteriorate. In 2016, Mayor Fulop allegedly sought a donation from Airbnb to his reelection campaign. Mayor Fulop attended a fundraiser at Airbnb's San Francisco headquarters in 2017 but still did not receive a donation. In May 2017, Mayor Fulop allegedly sent a number of emails to Airbnb expressing his frustration, and, in response, Airbnb sent a $10,172 contribution to his reelection campaign. Airbnb represented that, following the delay in the donation, the relationship "fractured," and Mayor Fulop began receiving donations from the hotel industry. App. 231.

Two years later, Mayor Fulop's office introduced Ordinance 19-077. Ordinance 19-077 was a significant policy change from Ordinance 15.137. Although it did not ban short-term rentals entirely, it imposed a number of new restrictions. First, short-term rentals in non-owner-occupied rentals were limited to sixty nights per year. If, as of the date the ordinance was adopted, an owner operated two properties, the owner could appoint an agent to reside at the second property without being subject to the sixty-day limit on that property. Second, Ordinance 19-077 banned the subleasing of properties by tenants on a short-term basis. As a result, only those who owned properties could rent on a short-term basis in Jersey City. To facilitate a transition period of approximately eighteen months, Ordinance 19-077 included certain exceptions. It exempted through January 1, 2021, for instance, any short-term rental reservations or bookings that were made before June 25, 2019, the date the ordinance was adopted. In addition, tenants who were subleasing their properties on a short-term basis as of the date of adoption could continue to do

6

so through January 1, 2021, or through the end of the lease, whichever came first.

On June 25, 2019, the Jersey City Council held a special meeting to vote on Ordinance 19-077. Operators of short-term rentals spoke against the ordinance, and Councilman James Solomon and Councilman Jermaine Robinson spoke in favor of the ordinance. Councilman Solomon acknowledged that the ordinance may have a negative financial impact on short-term rental operators but also explained that short-term rentals had a negative impact on union workers in Jersey City. Councilman Robinson expressed hope that investors could recoup some of the money they would lose as a result of the ordinance. The City Council voted 7–2 in favor of adopting the ordinance. On June 28, 2019, Mayor Fulop signed Ordinance 19-077 into law.

Between the passage of Ordinance 15.137 and Ordinance 19-077, the plaintiffs invested in properties in Jersey City to conduct short-term rental businesses. The Nekrilovs purchased two properties, which have monthly mortgage payments of $2,500 and $1,725. The Nekrilovs earned $9,500 and $5,183 per month, respectively, in short-term rental revenue, and allege that they would earn only $3,800 and $1,800 per month in long-term rental revenue. They also invested a total of $100,000 in renovating these properties. The Nekrilovs also entered into seventeen long-term leases with the intention of subleasing on a short-term basis. Tang and Jen purchased one property, which has a monthly mortgage payment of $3,300, and which Tang and Jen spent $40,000 to renovate and furnish. The property earned $4,500 per month in short-term rental revenue and would earn $2,600 in long-term rental revenue. Tang and Jen also entered

7

into two long-term leases and spent $6,600 and $8,900 to furnish the properties. Suen purchased two properties, which have monthly mortgage payments of $2,500 and $3,500. Suen and his mother invested approximately $383,000 into renovating the properties, $40,000 into furnishing the properties, and $130,000 in other costs for the properties. Suen and his mother earned approximately $30,000 in monthly short-term rental revenues from the two properties. At the time of filing the complaint, Suen and his mother had not turned a profit, but they estimated that they would become profitable in the near future.

In December 2019, the plaintiffs filed a complaint seeking a declaratory judgment providing that Ordinance 19-077 is unconstitutional, injunctive relief against enforcement of the ordinance, monetary damages, and attorneys' fees. The complaint asserted four claims: (1) violations of the Takings Clause of the Fifth Amendment; (2) violations of the Contract Clause of Article I; (3) Fifth and Fourteenth Amendments substantive due process claims; and (4) Fifth and Fourteenth Amendments procedural due process claims. The plaintiffs simultaneously filed a motion for a temporary restraining order ("TRO") and preliminary injunction. The City moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6). The District Court dismissed the complaint and denied as moot the motion for a TRO and preliminary injunction. The plaintiffs timely appealed.

II.

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over the District Court's final order dismissing the complaint under

8

28 U.S.C. § 1291. We exercise plenary review over the District Court's dismissal of the complaint, accepting all well-pled factual allegations as true and drawing all reasonable inferences in the plaintiffs' favor. See Phila. Taxi Ass'n v. Uber Techs., Inc., 886 F.3d 332, 338 (3d Cir. 2018). "To survive a motion to dismiss, a complaint must contain sufficient factual allegations, taken as true, to 'state a claim to relief that is plausible on its face.'" Fleisher v. Standard Ins. Co., 679 F.3d 116, 120 (3d Cir. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

## III.

The plaintiffs argue that the District Court erred in holding that the plaintiffs had not stated a regulatory takings claim. Relatedly, the plaintiffs argue that the court erroneously failed to recognize the plaintiffs' forward-looking rights to conduct their short-term rental businesses as cognizable property interests for purposes of their takings claim. The plaintiffs next argue that the District Court erred in dismissing their Contract Clause claim, which they allege impaired both short- and long-term rental contracts. Finally, the plaintiffs argue that the District Court erred in concluding that the plaintiffs failed to state a claim for a substantive due process violation.[2]

### A.

The Takings Clause of the Fifth Amendment of the United States Constitution prohibits the taking of private

---

[2] The plaintiffs did not appeal the dismissal of the procedural due process claim.

9

property "for public use, without just compensation." U.S. Const. amend. V. The Takings Clause applies to state and local governments through the Fourteenth Amendment. Newark Cab Ass'n v. City of Newark, 901 F.3d 146, 151 (3d Cir. 2018). A threshold determination in any takings case is whether the plaintiff has asserted a legally cognizable property interest. See In re Trustees of Conneaut Lake Park, Inc., 855 F.3d 519, 526 (3d Cir. 2017). "Without a legally cognizable property interest, [the plaintiff] has no cognizable takings claim." Id. Once a legally cognizable property interest has been identified, we examine whether there has been a taking of that property interest for public use without just compensation. Id. at 525.

Because there has been no physical taking of the plaintiffs' property, this case concerns an alleged regulatory taking. There are two types of regulatory takings: (1) takings per se or total takings, where the regulation denies all economically beneficial productive use of the property, see Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1019 (1992); and (2) partial takings that, though not rendering the property idle, require compensation under the test set forth in Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978).

1.

We must first determine what, if any, legally cognizable interests are at issue. As the District Court observed, plaintiffs assert three "uncontroversial" property rights: (1) plaintiffs' use and enjoyment of their purchased properties; (2) the long-term leases; and (3) the plaintiffs' short-term rental contracts. But the plaintiffs also assert another property interest: their forward-looking right to pursue their short-term rental

10

businesses.  Framed this way, the plaintiffs allege that they have lost "the entire businesses they were *expressly invited* by Jersey City to open and operate."  Nekrilov Br. 40 (emphasis in original).  The District Court rejected the argument that this constituted a legally cognizable property interest for the purposes of a takings claim.

While the Constitution protects property interests, it does not create property interests.  See Phillips v. Wash. Legal Found., 524 U.S. 156, 164 (1998).  Whether a plaintiff has a property interest is "determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'"  Id. (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)).

That does not mean that every municipal act legalizing a business activity vests the business owner with a cognizable property right.  The Supreme Court has explained that "business in the sense of *the activity of doing business*, or *the activity of making a profit* is not property in the ordinary sense."  Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675 (1999) (emphasis in original).  Consistent with this principle, we decline to recognize a general right to do business as a property interest cognizable under the Takings Clause.  As the District Court recognized, to hold otherwise would broaden the scope of the Takings Clause such that any business regulation could constitute a taking.

The plaintiffs point to several decisions in which, in the context of New Jersey tort law, courts recognized that the "[i]nvasion of 'the right to pursue one's business, calling or occupation free from undue interference or molestation' is an 'actionable infringement of a property right.'"  Longo v.

11

Reilly, 114 A.2d 302, 305 (N.J. App. Div. 1955) (quoting Louis Kamm, Inc., v. Flink, 175 A. 62, 66 (N.J. 1934)); see also Di Cristofaro v. Laurel Grove Mem'l Park, 128 A.2d 281, 285 (N.J. App. Div. 1957) (same); Zenith Lab'ys, Inc. v. Abbott Lab'ys, No. Civ. A. 96-1661, 1996 WL 33344963, at *5 (D.N.J. Aug. 7, 1996) (same). These are tort decisions. These decisions recognize a property right to pursue one's business in the context of unfair competition or tortious interference claims. As such, they are not applicable to the plaintiffs' takings claim. The plaintiffs do not cite any takings or due process decisions in which a federal court has recognized a cognizable property interest in the right to pursue one's business.

This does not mean that we disregard the impact that Ordinance 19-077 has had on the plaintiffs' businesses. To the extent that the ordinance has affected the economic value or use of the properties, we address that issue in the takings analysis. Moreover, we will consider the impact of the change in policy on the plaintiffs' reasonable, investment-backed expectations. We need not recognize a free-standing property right to pursue one's business in order to account for the effect that Ordinance 19-077 has had on the plaintiffs' short-term rental businesses.

The plaintiffs' forward-looking right to pursue their short-term rental businesses is not cognizable under the Takings Clause, but the plaintiffs have articulated three cognizable property rights: (1) use and enjoyment of their purchased properties; (2) long-term leases, see U.S. Tr. Co. of N.Y. v. New Jersey, 431 U.S. 1, 19 n.16 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."); and

(3) short-term rental contracts, see id. We next examine whether the passage of Ordinance 19-077 constitutes a taking of any of those property rights.

2.

Total takings or takings per se are those that deny the property owner all economically beneficial use of the property. See Murr v. Wisconsin, 137 S. Ct. 1942, 1942–43 (2017); Lucas, 505 U.S. at 1030. A taking has not occurred simply because a plaintiff has been denied the most profitable use of the property. See Andrus v. Allard, 444 U.S. 51, 66 (1979). Rather, a total taking is one that renders the property essentially idle. See Lucas, 505 U.S. at 1030.

The plaintiffs first allege that, as a result of Ordinance 19-077, they have lost all beneficial use of their purchased properties. The District Court held that because the properties retain numerous beneficial uses, they have not been rendered economically idle. We agree. The plaintiffs can lease the properties on a long-term basis, live at the properties, or sell the properties.[3] There is no total taking where the government

_____

[3] The plaintiffs argue that because they will be forced to sell the properties to avoid foreclosure, selling the properties should not count as a beneficial use. The plaintiffs are correct that the ability to sell a property does not always constitute an economically beneficial use. See Lost Tree Vill. Corp. v. United States, 787 F.3d 1111, 1117 (Fed. Cir. 2015). Specifically, "[w]hen there are no underlying economic uses, it is unreasonable to define land *use* as including the sale of the land." Id. (emphasis in original). Such was the case in Lost Tree, where the regulated parcel had essentially no uses other

13

seizes only one strand in the "bundle" of property rights. Andrus, 444 U.S. at 66. Here, that single strand is use of the properties for short-term rentals.

The plaintiffs argue that they cannot afford to keep the purchased properties without short-term rental income because "it is impossible to sustainably lease them under long-term leases." Nekrilov Br. 39 n.12. The plaintiffs cannot sustainably lease them on a long-term basis because "long-term rental income is much lower than short-term rental income, and thus would render [the plaintiffs'] investments unaffordable," App. 95, a fact that the plaintiffs considered in deciding not to enter the long-term rental market. If forced to rent the properties on a long-term basis, the plaintiffs claim that they would barely make enough to cover their mortgages and other costs, and in some cases, not enough to cover "related debt and expenses." App. 138.

The comparative disadvantage of long-term rentals does not amount to an allegation that long-term rentals are not an economically beneficial use of the property. The plaintiffs are, as the District Court recognized, attempting to argue that without the benefit of short-term rentals, they have been denied all profitable use of their properties. But the central question for a total taking is not "whether the regulation allows operation of the property as 'a profitable enterprise' for the

---

than speculative land sale based on the trivial value that the parcel retained. But here, there are other underlying economic uses — the plaintiffs (or anyone else) could live in or rent the properties on a long-term basis. We may therefore consider the plaintiffs' ability to sell the properties in determining whether there has been a total taking.

14

owners, but whether others 'might be interested in purchasing all or part of the land' for permitted uses." Park Ave. Tower Assocs. v. City of New York, 746 F.2d 135, 139 (2d Cir. 1984) (quoting Pompa Const. Corp. v. City of Saratoga Springs, 706 F.2d 418, 424 (2d Cir. 1983)). The plaintiffs do not allege that, across all potential purchasers, long-term leases are not an economically viable use of these properties. As the District Court observed, the extent to which Ordinance 19-077 has impacted the plaintiffs' anticipated return on their investments may be relevant to the partial takings analysis under Penn Central, but it has no relevance here. Because the purchased properties may still be put to multiple economically viable uses, there has been no total taking of the purchased properties.

The plaintiffs further argue that they have lost all economically beneficial use of the long-term leases. The District Court similarly rejected this argument, explaining that although the plaintiffs may no longer expect the same profits from short-term rentals, they may still make economically viable use of the properties by occupying the properties or sub-leasing the properties on a long-term basis. We agree. Because these leases may be put to other uses, there has not been a total taking of any long-term lease.[4]

---

[4] In any event, the complaint alleges that only four of the long-term leases extended past January 1, 2021. Any lease that ended prior to that date was unaffected by Ordinance 19-077, which provides that tenants may continue to host unlimited short-term subleases until January 1, 2021 or the end of the lease, whichever came first. Although the complaint does not specify the exact terms for each affected lease, in each case, the plaintiffs were paying rent and subleasing the affected properties at the time they filed the complaint in December

15

Finally, the District Court concluded that there had been no total taking of any of the preexisting short-term rental reservations. The District Court reasoned that Ordinance 19-077 did not entirely ban short-term rentals; it provided for a transition period for tenants and a limit of sixty nights per year for owners. The ordinance also provided an exception for short-term rental contracts that existed at the time the ordinance passed and that concluded before January 1, 2021. The complaint did not plead that these preexisting reservations did not qualify for any exception, and so the District Court concluded that there had been no total takings of the short-term reservations. Following oral argument on appeal, the plaintiffs submitted a letter to this Court indicating that "no formal short-term bookings through AirBnB or similar service were cancelled solely as a result of Ord. 19-077." Doc. 43. Accordingly, there has been no total taking of any of the plaintiffs' short-term rental contracts.

Because neither the purchased properties nor the long-term leases have been deprived of all economically viable use, the District Court properly concluded that the plaintiffs had not stated a claim for a total taking or taking per se.

3.

One whose property has not been deprived of all economically beneficial use may still be entitled to compensation if the government action constitutes a partial taking under the Penn Central factors. The factors are: "(1) the

2019. The plaintiffs were able to continue using these leases for short-term rentals between, at a minimum, December 2019 and January 1, 2021.

16

economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." Murr, 137 S. Ct. at 1943. Although the test is flexible, the Penn Central "inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 540 (2005).

The District Court held that all three Penn Central factors weighed against a taking and dismissed the plaintiffs' partial takings claim. For the reasons that follow, we agree.

a.

We first consider the economic impact of Ordinance 19-077 on the plaintiffs. It is undisputed that Ordinance 19-077 has impacted the plaintiffs' short-term rental businesses. In Appendix A of its opinion, the District Court summarized the effects, as alleged in the complaint. The court roughly estimated that plaintiffs may have lost between 50% and 66% of their potential revenue from short-term rentals. The court concluded that, even treating this loss of potential revenue as a loss in the "value" of the property, this factor weighed against the plaintiffs because they did not account for alternative ways to exploit the properties. The District Court also declined to adopt lost profits as a measure of economic impact because the plaintiffs' projected lost profits were speculative. The plaintiffs allege that the District Court engaged in improper factfinding in holding that their lost profits were too speculative.

17

When evaluating a takings claim under the Penn Central factors, the economic impact of a regulation is usually measured in terms of its effect on the value of the property. See Rose Acre Farms, Inc. v. United States, 559 F.3d 1260, 1268–69 (Fed. Cir. 2009) (collecting cases); see also United States v. 68.94 Acres of Land, 918 F.2d 389, 393 n.3 (3d Cir. 1990).  Here, the plaintiffs do not argue that the values of the underlying properties or leases have decreased; they instead argue that they have been denied the opportunity to profit from and to obtain a "reasonable return" on their investments. Nekrilov Br. 42 (quoting Penn Cent., 438 U.S. at 136).  The loss of profitable uses of property is occasionally considered in takings cases as a measure of economic impact, see, e.g., Pace Res., Inc. v. Shrewsbury Twp., 808 F.2d 1023, 1031 (3d Cir. 1987), but as the Supreme Court explained:

> [L]oss of future profits-unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim. Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform.  Further, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests.

Andrus, 444 U.S. at 66.

As to the purchased properties, we agree with the District Court that lost profits are not an appropriate a measure of economic impact.  First, not all of the plaintiffs were profitable as of the filing of the complaint.  Suen, who

18

purchased two properties, had not turned a profit on either property, although he considered himself "at a point where [the investments] will become profitable in the near future," based on his assumption that he would be able to continue operating his short-term rental business "indefinitely." App. 137. His alleged lost profits are entirely speculative. Second, the Nekrilovs, Tang, and Jen, who have profited from their short-term rental businesses, do not allege that they could not profitably sell their purchased properties. As the District Court explained, their lost-profit claims fail to account for other potentially profitable uses of the properties, the most obvious of which is to sell the properties. Suen alone alleges that he would be forced to sell his two purchased properties at a net loss, accounting for "two down payments, the two mortgage payments, and the costs of renovations, etc." App. 138–39. But the complaint does not quantify that estimated loss, and it bases this claim at least in part on a prediction that Ordinance 19-077 "will likely deflate prices" of residences in Jersey City. App. 139. There is nothing in the complaint to suggest that the value of the plaintiffs' purchased properties have declined as a result of Ordinance 19-077 or otherwise. See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) ("[C]onclusory or 'bare-bones' allegations will [not] survive a motion to dismiss . . . .").

But even if we considered the loss of potential short-term rental revenue as a decrease in the underlying value of the properties, that too would be insufficient. The plaintiffs do not allege that the market values for any of the purchased properties have decreased or that market values for long-term rents have decreased as a result of Ordinance 19-077. Accordingly, the only alleged loss in "value" is the lost revenue from short-term leases that cannot be recouped from long-term

leases or from selling the properties. The complaint does not specify the value of this loss, but the District Court estimated that, where both long- and short-term market rents are provided in the complaint, the plaintiffs stand to lose between approximately 50% and 66% of their rental revenue, which is a fraction of the properties' value. As this Court has observed, the Supreme Court "has required compensation only in cases in which the value of the property was reduced drastically." Rogin v. Bensalem Twp., 616 F.2d 680, 692 (3d Cir. 1980). The plaintiffs have undeniably lost potential future profits as a result of Jersey City's change in policy. But the plaintiffs' inability to continue to operate their short-term rental businesses profitably does not equate to a "drastic[]" reduction in the value of the property so as to require compensation, especially as the properties retain multiple economically beneficial uses.

As to the long-term leases, the complaint indicates that those leases ended in 2020 or 2021. Ordinance 19-077 permitted tenants to continue to sublease on a short-term basis through January 1, 2021. The complaint identifies four leases that extended past this transition period: two leases ending on June 30, 2021, and two leases ending on August 31, 2021. The complaint is not clear as to precisely when the leases started, but the plaintiffs were paying rent on the affected leases prior to the filing of the complaint in December 2019. Accordingly, the Nekrilovs, Tang, and Jen were able to use the leased properties for the most profitable use — short term rentals — for the majority of the lease term. Moreover, as with the purchased properties, the leased properties retain multiple beneficial uses. The plaintiffs can live in the properties or sublet them on a long-term basis. Long-term rental rates are indisputably lower than short-term rates, but the plaintiffs

20

acknowledge that they pay "market rent." App. 116, 119–21, 126–27. The District Court properly recognized that the plaintiffs have not alleged why their losses would be "drastic" if they can sublet the properties at market rate on a long-term basis.

"Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." Penn. Coal Co. v. Mahon, 260 U.S. 393, 413 (1922). To govern effectively, governments must be able to "execute laws or programs that adversely affect recognized economic values." Penn Cent., 438 U.S. at 124. The plaintiffs have unquestionably been negatively affected by the City's change in residential zoning laws, but the plaintiffs' inability to continue to profit at the same levels from their investments is insufficient to state a takings claim.

For the foregoing reasons, we conclude that this factor weighs against finding a taking of plaintiffs' purchased properties or long-term leases.[5]

b.

We next turn to the second factor — the extent to which Ordinance 19-077 has interfered with the plaintiffs' distinct, investment-backed expectations. "[D]istinct, investment-backed expectations are reasonable only if they take into

---

[5] The complaint initially pled that Ordinance 19-077 constituted a taking of existing reservations, but the plaintiffs subsequently informed this Court that no existing short-term rentals were cancelled due to the ordinance.

21

account the power of the state to regulate in the public interest." Pace Res., 808 F.2d at 1033. The plaintiffs do not suffer a taking requiring compensation merely because "they have been denied the ability to exploit a property interest that they heretofore had believed was available for development." Penn Cent., 438 U.S. at 130. Nor does the Takings Clause mean that "once a property has been devoted to a particular use, the owner has a reasonable expectation of being able to continue with that use absent the payment of compensation." Pace Res., 808 F.2d at 1032.

Zoning regulations are the "classic example" of permissible regulations that do not require compensation even where they "prohibit[] the most beneficial use of the property." Penn Cent., 438 U.S. at 125. And even though zoning laws "generally do not affect existing uses of real property," the Supreme Court has rejected takings claims "when the challenged governmental actions prohibited a beneficial use to which individual parcels had previously been devoted and thus caused substantial individualized harm." Id. at 125–27 (collecting cases). However, the actions of the state can impact the analysis, in particular, where the state invited the activity with promises to protect property rights. See, e.g., Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1010–11 (1984).

The District Court held that, although a closer question, this factor ultimately weighed against finding a taking because the plaintiffs had failed to consider the City's power to regulate residential housing in the public interest. We concur.

The plaintiffs make three arguments that Ordinance 19-077 undermines their distinct, investment-backed expectations. First, the plaintiffs argue that this case differs

22

from <u>Penn Central</u> and <u>Pace</u> in that the applicable statutes in both of those decisions affected prospective uses of the properties. Here, Ordinance 19-077 affects an already-existing use of the purchased properties and long-term leases. But this Court has made clear that disruption of a present use is not enough. <u>See</u> <u>Pace Res.</u>, 808 F.2d at 1032–34.

Second, the plaintiffs emphasize that this case is unique because Ordinance 15.137 and the statements made by Jersey City officials invited and encouraged them to invest in Jersey City real estate for the purpose of exploiting the properties as short-term rentals. These actions, the plaintiffs argue, established an expectation that they could continue to lease their properties indefinitely on a short-term basis. The plaintiffs point to various statements made by Mayor Fulop and City Council members encouraging investors to come to Jersey City.[6] By affirmatively legalizing short-term rentals — and advertising that legalization — the City communicated to the plaintiffs that their short-term rental businesses were welcome there. That does not mean that the plaintiffs' expectations that they could run those businesses, indefinitely, without additional restrictions, were reasonable. As the District Court noted, Ordinance 15.137 and the very articles cited by plaintiffs also contain statements that qualify the legalization of short-term rentals.[7] Mayor Fulop cautioned that lessors

---

[6] Some of these articles, as the District Court noted, quote city officials but were not written or specifically endorsed by anyone associated with the City. The complaint does not allege that the City approved the broader contents of these articles.

[7] Courts may consider in deciding a motion to dismiss documents that are "integral to or explicitly relied upon in the complaint" without converting the motion to a motion for

could not "rent out so many rooms as to create an informal hotel" or "change the nature of the neighborhood." App. 223. Jersey City did not want to be "in the business of disallowing a service like Airbnb . . . that lets middle-class folks earn a bit of extra income by renting out their apartments." Id. And Ordinance 15.137 provided that short-term rentals may not "materially disrupt the residential character of the neighborhood." App. 162.

Third, plaintiffs argue that "where the government itself *affirmatively engenders* the property owner's investment-backed expectation, its subsequent subversion of that expectation can be so overwhelming as to dispose of the takings question entirely." Nekrilov Br. 31 (emphasis in original). The plaintiffs point to two decisions in which courts found takings where the state made explicit promises to property owners. See Ruckelshaus, 467 U.S. at 1005, 1010–11; Kaiser Aetna v. United States, 444 U.S. 164, 179–80 (1979). Both decisions involve explicit promises that are not present here. In Ruckelshaus, the plaintiff, Monsanto Co., submitted trade secret data to the Environmental Protection Agency ("EPA") based on "explicit assurance[s]" that the data would not be publicly disclosed. 467 U.S. at 1011. After the EPA later disclosed the data, the Supreme Court held that Monsanto had a reasonable expectation that its data would not be published and that a taking had occurred. See id. at 1011–13. In Kaiser, the plaintiff owned a private pond and received permission from government officials to connect the pond to navigable waters, permission that was not conditioned on

_____

summary judgment. Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)) (emphasis omitted).

24

public access to the pond. See 444 U.S. at 179. The government subsequently attempted to require the pond owner to permit public access to the pond on the basis that it was connected to navigable waters, imposing a navigable servitude on the former pond. See id. at 179–80. Although consent of a government official cannot estop the government, the Supreme Court held that it can "lead to the fruition of a number of expectancies embodied in the concept of 'property'— expectancies that, if sufficiently important, the Government must condemn and pay for before it takes over." Kaiser, 444 U.S. at 179. The Court acknowledged that "the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests." Id. at 179–80. The Court concluded that if the government wanted public access to the former pond "after petitioners [had] proceeded as far as they [had] . . . , it may not, without invoking its eminent domain power and paying just compensation, require them to allow free access to the dredged pond." Id. at 180.

Both decisions rest on explicit assurances that are not present in this case.[8] Ordinance 15.137 placed qualifications

---

[8] The plaintiffs also cite to Washington Market Enterprises, Inc. v. City of Trenton, 343 A.2d 408, 409 (N.J. 1975). That decision is inapplicable. As the first step in an urban renewal project, Trenton first declared the plaintiff's property "blighted." Id. at 410. That designation had a negative effect on the property, and the plaintiff could no longer find tenants. Trenton subsequently abandoned the project without condemning and acquiring the property, and therefore without paying the plaintiff. Id. at 410. That was the source of the

on the operation of short-term rentals, including that such rentals could not change the character of the neighborhood and a limit on the number of rentals an investor could operate without obtaining a license. Mayor Fulop publicly explained that the purpose of Ordinance 15.137 was to permit the middle-class to earn additional income by renting out their homes but not to permit investors to create "informal hotel[s]." App. 224. And as this Court has explained, "[t]he general expectation of regulatory change is no less present where the value of the property interest is derived from the regulation itself." Newark Cab Ass'n, 901 F.3d at 153 (quoting Minneapolis Taxi Owners Coal., Inc. v. City of Minneapolis, 572 F.3d 502, 509 (8th Cir. 2009)) (alteration in original).

The plaintiffs may have relied on Ordinance 15.137 in deciding to invest in short-term rentals in Jersey City, but they failed to take into account the restrictions in place in the original ordinance and the City's strong interest in regulating residential housing. On balance, this factor weighs against the plaintiffs.

c.

Finally, we turn to the character of Ordinance 19-077. As the District Court observed, a taking is more "readily . . . found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." Penn. Cent., 438 U.S. at 124 (quotation marks omitted). This is

---

unfairness identified by the New Jersey Supreme Court. This decision is, therefore, inapposite.

26

especially true when the regulation concerns housing. The Supreme Court has "consistently affirmed that States have broad power to regulate housing conditions in general." Yee v. City of Escondido, 503 U.S. 519, 528 (1992) (citation omitted). In particular, courts are more likely to uphold a regulation that "applies generally to a broad class of properties." Rogin, 616 F.2d at 690. However, a regulation that "substantially furthers important public policies may so frustrate distinct investment-backed expectations as to amount to a 'taking.'" Penn Cent., 438 U.S. at 127 (citing Mahon, 260 U.S. at 414); see also Mahon, 260 U.S. at 414–16 (holding that a regulation banning mining that caused subsistence of the surface property was a taking of the plaintiffs' mining rights where the regulation merely "shift[ed] the damages" from the plaintiffs to the surface owners).

The plaintiffs contend that the City, Mayor Fulop, and the City Council did not act in good faith in passing Ordinance 19-077. They argue that Mayor Fulop, after deliberately enticing investors to come to Jersey City, turned on short-term rentals as a result of his personal frustrations with Airbnb. But as the District Court observed, regardless of Mayor Fulop's subjective motivations, the council members voted 7-2 for the regulation, and the complaint does not attribute bad faith motives to these council members.

The plaintiffs next argue that Councilman Solomon admitted to voting for the 2019 Ordinance to benefit those in hotel trade unions and that "alone is sufficient for a finding of a taking." Nekrilov Br. 47. The plaintiffs rely on Arkansas Game & Fish Commission v. United States, 736 F.3d 1364 (Fed. Cir. 2013), for the proposition that where the government legislates to benefit a certain industry or trade group, there has

27

been a taking. Arkansas Game concerned a physical taking, which is not subject to the Penn Central analysis. In Arkansas Game, the government temporarily flooded an area in response to requests from agricultural interests. See id. at 1370. Ordinance 19-077 by contrast is targeted at residential housing generally, regardless of Councilman Solomon's subjective intentions. The plaintiffs also ignore the larger context of Councilman Solomon's statement. Councilman Solomon expressed support for hotel union workers, but he also commented on the harmful effects that short-term rentals had on the residential housing market and on the potential benefits of more long-term residents in Jersey City.[9] Councilman Solomon's statements reflect the same public purposes articulated in Ordinance 19-077.

Ordinance 19-077 is a general zoning regulation restricting the permissible uses of residential housing with the goals of protecting the residential housing market in Jersey City and promoting public safety by reducing the nuisance behavior associated with short-term rentals. We agree with the District Court's conclusion that this factor weighs against a taking.

\* \* \* \* \*

The Penn Central takings test serves to "identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." Lingle, 544

---

[9] The complaint relies on and incorporates by reference the remarks made at the special council meeting held on June 25, 2019.

28

U.S. at 539.  The ordinance effects neither a taking per se nor its functional equivalent of the plaintiffs' property.  The plaintiffs have certainly suffered losses as a result of Ordinance 19-077, but they have not been denied all economically beneficial use of their properties and therefore have not suffered a total taking.  Nor have the plaintiffs stated a partial takings claim under the Penn Central factors.  Accordingly, we will affirm the District Court's dismissal of the plaintiffs' takings claim.

B.

The plaintiffs next argue that the District Court erred in dismissing their Contract Clause claim.  We disagree and will affirm the District Court's dismissal of this claim.

The Contract Clause of Article I of the Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1.  Despite its broad language, the Contract Clause does not disrupt a state's ability to exercise its police powers in service of the public interest, even if it affects existing contracts.  See Watters v. Bd. of Sch. Dirs. of Scranton, 975 F.3d 406, 412 (3d Cir. 2020).  To decide whether legislation violates the Contract Clause, the court first determines whether the legislation has substantially impaired the contractual relationship.  See Sveen v. Melin, 138 S. Ct. 1815, 1821–22 (2018).  If so, the court then "turns to the means and ends of the legislation" and evaluates whether the legislation (1) has "a significant and legitimate public purpose," and (2) "is drawn in an appropriate and reasonable way to advance" that public purpose.  Id. at 1822 (quotation marks omitted); see also United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l

29

Union AFL-CIO-CLC v. Gov't of Virgin Islands, 842 F.3d 201, 211 (3d Cir. 2016). When determining whether legislation is drawn in a necessary and reasonable way, and where the state is not itself a party to the affected contract, "the State is ordinarily entitled to deference in its legislative judgment." United Steel, 842 F.3d at 212. The Contract Clause "applies equally to municipal ordinances" as it does to state legislation. Alarm Detection Sys., Inc. v. Village of Schaumburg, 930 F.3d 812, 822 (7th Cir. 2019).

The District Court dismissed the plaintiffs' Contract Clause claim based on both the long-term leases and the short-term contracts. The court concluded that the plaintiffs had not alleged facts sufficient to show that the City did not have a substantial public purpose in passing Ordinance 19-077. The Contract Clause claim must therefore fail regardless of whether Ordinance 19-077 had substantially impaired any existing contract.

The plaintiffs originally alleged that Ordinance 19-077 impaired both short-term rental contracts and the long-term leases into which the Nekrilovs, Tang, and Jen entered. However, as discussed before, the plaintiffs submitted a letter following oral argument to this Court indicating that the plaintiffs did not cancel any existing short-term rentals solely due to Ordinance 19-077. Because the Contract Clause protects only existing contracts, see Bray v. Ins. Co. of Pa., 917 F.2d 130, 135 (4th Cir. 1990) ("To violate the [C]ontracts [C]lause the legislature must alter an existing contract."); see also Sveen, 138 S. Ct. at 1821; Watters, 975 F.3d at 412, contracts entered into after the passage of Ordinance 19-077 are not impaired within the meaning of the Contract Clause, see Easthampton Sav. Bank v. City of Springfield, 736 F.3d

30

46, 50 n.5 (1st Cir. 2013) ("[A] state law with only prospective effect will not violate the Contracts Clause because it will not impair an existing contractual relationship."). The District Court therefore did not err in dismissing the plaintiffs' Contract Clause claim to the extent that it was based on the alleged impairment of any short-term rental contracts.

The plaintiffs further argue that Ordinance 19-077 impaired the long-term leases. To determine whether a regulation has substantially impaired an existing contract, we "consider[] the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." Sveen, 138 S. Ct. at 1817. The plaintiffs have not articulated how Ordinance 19-077 has substantially impaired the contractual relationships between the lessors and the plaintiffs. Ordinance 19-077 has no effect on the plaintiffs' obligations to pay rent to the long-term landlords or the landlords' obligations to provide the plaintiffs with access to the property. Ordinance 19-077 does not negate the plaintiffs' ability to sublet but limits the plaintiffs to long-term sublets. The plaintiffs suggest that because unlimited short-term rentals were legal at the time they entered into the long-term leases, Ordinance 19-077 undermines their legitimate expectations that they could indefinitely conduct short-term sublets. As we have explained, it is not reasonable for the plaintiffs to conclude from the passage of Ordinance 15.137 that they could continue to conduct short-term rentals indefinitely without additional restrictions. The plaintiffs do not articulate any other way in which Ordinance 19-077 has impaired their long-term leases.

31

But as the District Court observed, even assuming Ordinance 19-077 substantially impaired the long-term leases, the plaintiffs have still failed to plead a Contract Clause claim because the City has articulated a legitimate public purpose for the Ordinance, which was drawn in an appropriate and reasonable manner. A legitimate public purpose is one that is "aimed at remedying a broad and general social or economic problem." United Steel, 842 F.3d at 211. Ordinance 19-077 articulates multiple public purposes, including the desire to protect the residential character of neighborhoods and reduce nuisance activity associated with short-term rentals. The plaintiffs suggest that these purposes are not legitimate because of Mayor Fulop's personal dissatisfaction with Airbnb. The plaintiffs do not cite any decision which would permit this Court to take into account the subjective intent of the individual legislators.

That there is a significant and legitimate public purpose for Ordinance 19-077 does not end our inquiry. See id. We must next decide whether the ordinance is "both necessary and reasonable to meet the purpose advanced by the [City] in justification." Id. But as the Supreme Court has repeatedly held, where the state is not itself a party to the affected contract, "courts should properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 505 (1987) (quotation marks omitted). The City is not a party to any of the long-term leases and therefore is entitled to deference in its judgments regarding the necessity and reasonableness of Ordinance 19-077. The City has expressed in Ordinance 19-077 that short-term rentals can negatively affect the long-term housing supply, have "deleterious" affects on residential neighborhoods, and impact the character of

32

residential neighborhoods and determined that restrictions on such rentals are necessary. App. 147. We therefore "refuse to second-guess the [the City's] determinations" that restrictions on short-term rentals "are the most appropriate ways of dealing with the problem." DeBenedictis, 480 U.S. at 505.

Accordingly, we will affirm the District Court's dismissal of the plaintiffs' Contract Clause claim.

C.

The plaintiffs next argue that the District Court erred in dismissing their substantive due process claim. The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Substantive due process is a "component of the [Fourteenth Amendment] that protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)). There exist two "threads" of substantive due process actions: "substantive due process relating to legislative action and substantive due process relating to non-legislative action." Newark Cab Ass'n, 901 F.3d at 155. Legislative acts are subjected to rational basis review. See Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff, 669 F.3d 359, 366 (3d Cir. 2012).[10] The City must demonstrate "(1) the existence of

---

[10] A non-legislative action "violates substantive due process if arbitrary, irrational, or tainted by improper motive, or if so egregious that it shocks the conscience." Cnty. Concrete Corp.

a legitimate state interest that (2) could be rationally furthered by the statute." Id. This Court has held that where a New Jersey municipal body votes for "'a change in the permitted uses in a zoning district,' the act is legislative in character." Cnty. Concrete Corp., 442 F.3d at 169 (quoting Timber Props., Inc. v. Chester Twp., 500 A.2d 757, 763 (N.J. Super. Ct. App. Div. 1984)).

The test is easily satisfied here. As the District Court observed, Ordinance 19-077 articulates several legitimate state interests furthered by the change in regulation: (1) protecting the long-term housing supply; (2) reducing "deleterious effects" on neighborhoods caused by short-term rentals; and (3) protecting the residential character and density of neighborhoods. App. 147. This Court has reversed a grant of a motion to dismiss substantive due process claims related to zoning changes where the complaint contained no facts "that would indicate any possible motivation for the enactment of the Ordinance other than a desire to prevent appellants from continuing to operate and expand their . . . business." Cnty. Concrete Corp., 442 F.3d at 170. But here, the face of the ordinance articulates the very state interests that the ordinance furthers.

The plaintiffs argue that Mayor Fulop was subjectively motivated by his dissatisfaction with Airbnb over campaign donations. But the subjective intentions of the legislators are "constitutionally irrelevant." Flemming v. Nestor, 363 U.S. 603, 612 (1960). And the plaintiffs do not make any other legal arguments in support of their substantive due process claim.

---

v. Town of Roxbury, 442 F.3d 159, 169 (3d Cir. 2006) (quotations omitted).

34

For these reasons, we will affirm the District Court's dismissal of the substantive due process claim.[11]

## IV.

For the foregoing reasons, we will affirm the judgment of the District Court.

---

[11] Finally, the plaintiffs challenge the District Court's denial of their motion for a preliminary injunction. The District Court, having dismissed the complaint, denied the motion as moot. Because we will affirm the District Court's dismissal of the complaint, this issue is moot, and we will affirm the District Court's denial of the plaintiffs' injunction motion.

BIBAS, *Circuit Judge*, concurring.

I join the majority's excellent opinion in full. And I write separately only to offer thoughts on a question that the majority need not resolve today: what should be the test for regulatory takings?

Modern regulatory-takings doctrine has a laudable goal: protecting property owners against novel, potent, and intrusive regulations. To make that happen, the Supreme Court has given us a few different tests. But they overlap and are notoriously hard to apply. Worse, they are unmoored from the Constitution's text.

The better solution is to go back to the Takings Clause's original public meaning. Under that standard, the government would have to compensate the owner whenever it takes a *property right* and presses it into public use—even if the taking did not involve a physical invasion.

## I. THE LAY OF THE LAND: TAKINGS DOCTRINE TODAY

The Takings Clause bans "tak[ing]" "private property … for public use, without just compensation." U.S. Const. amend. V. A century ago, the Supreme Court suggested that not only confiscations, but also regulations, can be takings if they "go[ ] too far." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

But regulatory-takings doctrine is a mess. To identify regulations that "go[ ] too far," we apply various tests. Regulations that authorize even a temporary physical invasion are per se takings, regardless of their economic impact. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2073–74 (2021). So are

regulations that leave land "without economically beneficial or productive options for its use." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1018–19 (1992).

But for all other regulations, we conduct an "essentially ad hoc, factual inquir[y]." *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). As with the other tests, we ask whether the regulation can be characterized as a "physical invasion." *Id.* (also describing this prong as the "character of the governmental action"). But we look at its "economic impact" as well, especially how much it "interfere[s] with distinct investment-backed expectations." *Id.* And we may weigh other unidentified, "relevant" factors too. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002) (internal quotation marks omitted).

Applying the *Penn Central* factors is challenging. For one, they are hard to define and thus hard to meet. *See Bridge Aina Le'a, LLC v. Hawaii Land Use Comm'n*, 141 S. Ct. 731, 731–32 (2021) (Thomas, J., dissenting from denial of certiorari); Steven J. Eagle, *The Four-Factor* Penn Central *Regulatory Takings Test*, 118 Penn. St. L. Rev. 601, 605 (2014).

This case highlights some of the difficulties. Take "economic impact." The investors argue that the city's regulation destroyed two thirds of their properties' profitability. But precedent is muddy on whether lost profits count as an economic burden. *Compare Penn Cent.*, 438 U.S. at 127, 129 n.26 (considering the property owners' "ability to profit"), *and Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 499 (1987) (same), *with Andrus v. Allard*, 444 U.S. 51, 66 (1979)

(suggesting that lost profits "provide[] a slender reed upon which to rest a takings claim").

Plus, we do not know how severe an economic loss must be to satisfy that factor. Indeed, the Supreme Court has declined to spell out a "mathematically precise" formula. *Tahoe-Sierra*, 535 U.S. at 326 & n.23 (internal quotation marks omitted). Precedent suggests that very few regulatory takings suffice. Though wiping out almost all of a property's value might count, other severe devaluations do not. *Compare Lucas*, 505 U.S. at 1016–19 nn.7–8 (suggesting that 95% reduction in value might suffice), *with Penn Cent.*, 438 U.S. at 131 (cataloguing rejected claims for 75% and 87.5% reductions), *and Pace Res., Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1031 (3d Cir. 1987) (rejecting 90% reduction). And that calculation is tricky for another reason: it is "unclear" whether total deprivations of one use of land should be treated as deprivations of one property right or "a mere diminution in the value of the tract as a whole." *Lucas*, 505 U.S. at 1016 n.7.

Or consider "investment-backed expectations." Here, the investors argue that city officials' statements led them to reasonably expect that they could keep short-term leasing. But "investment-backed expectations are reasonable only if they take into account the power of the state to regulate in the public interest." *Pace Res.*, 808 F.2d at 1033; *see also Good v. United States*, 189 F.3d 1355, 1361–62 (Fed. Cir. 1999). Perhaps the investors must point to something close to a promise that their property interests would be protected. *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1008–10 (1984). If so, it is

unclear where "investment-backed expectations" fall in the gray area between expected regulations and formal contracts.

Even considering these issues, this case is clear. The investors have not shown a regulatory taking. But in closer cases, the lack of rules and guidance invites chaos.

Applying *Penn Central* can be hard for a second reason: we do not know how much weight to give each factor. Courts often knock out regulatory-takings claims for lacking one factor. *See, e.g.*, *Palazzolo*, 533 U.S. at 634–35 (O'Connor, J., concurring) (chiding lower court for giving "investment-backed expectations … exclusive significance"); *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1123 (9th Cir. 2010) (en banc) (Bea, J., dissenting) (objecting that the majority "converts a three-factor balancing test into a 'one-strike-you're-out' checklist"); Adam R. Pomeroy, Penn Central *After 35 Years: A Three Part Balancing Test or a One Strike Rule?*, 22 Fed. Cir. Bar J. 677, 689 (2013) (empirical study "show[ing] that the actual practice of the courts is to use the *Penn Central* test not as a balancing test but as a checklist, … habitually failing to utilize or analyze all three factors").

This one-strike-you're-out practice is especially troubling because *Penn Central* overlaps with per se regulatory takings claims. The first *Penn Central* factor considers whether the regulation can be characterized as a physical invasion. But physical invasions are also per se takings. *Cedar Point*, 141 S. Ct. at 2073–74. Smart lawyers will frame their challenges as per se takings if they can. But where does that leave *Penn Central*?

Perhaps most importantly, *Penn Central* is hard to apply because it is not "ground[ed] … in the Constitution as it was originally understood." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1957 (2017) (Thomas, J., dissenting). Thus, rather than look to history for answers to regulatory-takings questions, we must puzzle through *Penn Central*'s factors. Recognizing these problems, Justice Thomas recently encouraged his colleagues to clarify whether there is any "such thing as a regulatory taking" and "if there is, … make clear when one occurs." *Bridge Aina*, 141 S. Ct. at 732.

Though I am bound by Supreme Court precedent, I can still take up part of Justice Thomas's challenge. I suggest that the Takings Clause, originally understood, would have allowed regulatory-takings claims for regulations that take a state-law property right and press it into public use.

## II.  REGULATORY TAKINGS AND THE ORIGINAL PUBLIC MEANING

To discern the Constitution's original public meaning, we start with its text. The Fifth Amendment bars the government from "tak[ing]" "private property" "for public use, without just compensation." U.S. Const. amend. V. That spare clause holds three key textual puzzles: What counts as "private property"? When is it "taken"? And when is that taking "for public use"? The answers reveal that the Constitution requires compensating regulatory takings only when a law takes a recognized property right.

First comes "property." At the Founding, "property" included more than just the right to exclude. Blackstone's

5

*Commentaries*, for example, had a "broad" conception of property that extended beyond physical possession. *See* William Michael Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782, 827 (1995) (summarizing Blackstone). It defined the right to property as consisting in the "free use, enjoyment, and disposal of all of [one's] acquisitions, without any control or diminution." 1 William Blackstone, *Commentaries* *134.

The Founders shared this broad conception. *See* Treanor at 827 & n.234 (describing the Founders' definitions). James Madison, for instance, approvingly quoted Blackstone's understanding that property included the whole "dominion which one man claims and exercises over the external things of the world." James Madison, *Property,* National Gazette (Mar. 27, 1792), https://perma.cc/WN9Q-X3FE. (Indeed, he would have gone further and defined property as anything of "value" or any "right." *Id.*) This approach treats "property" broadly enough to include rights beyond physical possession of land or chattels.

Second is "taken." Dictionaries of the time defined "to take" in many ways. But because property encompassed both physical and intangible rights, the "aptest, most likely sense[ ]" covered both physical seizure and non-physical deprivation. Antonin Scalia & Bryan Garner, *Reading Law* 418 (2012); *see Take* (defs. 2, 67), Samuel Johnson, *A Dictionary of the English Language* (1755) (defining "take" to cover both physical seizure ("[t]o seize what is not given") and intangible deprivations ("[t]o deprive of")); *To Take*, Thomas Sheridan, *A Complete Dictionary of the English Language* (5th ed. 1789) (same).

Indeed, in other contexts, the Framers used "take" to refer to non-physical deprivations. In *Federalist* No. 44, for example, James Madison discussed "tak[ing]" the "right of coining money" from the states. *The Federalist* No. 44, at 231 (James Madison) (George W. Carey & James McClellan eds., Gideon ed. 2001). A few essays later, he mentioned the rights "taken away" from slaves. *The Federalist* No. 54, at 283 (James Madison). And at the Constitutional Convention, delegates discussed "tak[ing]" sovereignty and authority over the militia from the states and "tak[ing]" responsibility from the executive branch. 1 *The Records of the Federal Convention of 1787*, at 42, 545 (Max Farrand ed. 1911); 2 *Records* at 331. So at the Founding, deprivations of property rights would have been takings, regardless of whether they involved physical intrusions.

Last is "for public use." In the eighteenth century, that would have signified "*employing*" the taken property interest "to any purpose" for the "good of the community." *Use* (def. 1) and *Publick* (def. 4), Samuel Johnson, *A Dictionary of the English Language* (1755) (emphasis added). "Employing" property means more than just regulating the owner's chosen use. It means pressing property into a government-approved use instead. *See* Jed Rubenfeld, *Usings*, 102 Yale L.J. 1077, 1150 (1993). Grammatically, the clause limits only "use[s]" for the public, not bans or limits. *Id.* at 1114–18. So preventing a nuisance is not "us[ing]" the property and does not require just compensation. *See Kelo v. City of New London*, 545 U.S. 469, 510 (2005) (Thomas, J., dissenting) ("Blackstone and Kent, for instance, both carefully distinguished the law of nuisance from the power of eminent domain.").

The text of the Takings Clause naturally reads broadly enough to reach not only physical seizures, but also deprivations of any property right to serve a governmental use. And cases leading up to the Fourteenth Amendment—which may well be relevant to the meaning of the Clause as incorporated against the states—confirm that reading. *See generally* Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, but the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008). *But cf. N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2163 (2022) (Barrett, J., concurring) (noting the open question whether, for rights incorporated against the states, courts should consider the original public meaning as of 1791 or 1868).

True, there are not many cases from the Founding to Reconstruction. At the Founding, a handful of state constitutions did not limit takings, and those with takings clauses did not require compensation. Steven G. Calabresi, Sarah E. Agudo & Kathryn L. Dore, *State Bills of Rights in 1787 and 1791: What Individual Rights Are Really Deeply Rooted in American History and Tradition?*, 85 S. Cal. L. Rev. 1451, 1505–06 (2012). And the federal government sometimes relied on states to condemn property for federal use. *See Kohl v. United States*, 91 U.S. 367, 373 (1875). But the cases that exist show that takings were not limited to physical invasions. Regulations could count if they deprived owners of a valid property right for some public use.

In *Gardner v. Trustees of Newburgh*, for instance, a New York law empowered a village to divert a stream to supply

itself with water. 2 Johns. Ch. 162, 163–64 (N.Y. Ch. 1816). In doing so, the village cut off the flow of water to Gardner's land. *Id.* The Chancery Court held that this was a taking because Gardner's "right to a stream of water is as sacred as a right to the soil over which it flows." *Id.* at 165–66; *accord Cooper v. Williams*, 5 Ohio 391, 392 (1832); *see also Stevens v. Proprietors of the Middlesex Canal*, 12 Mass. 466, 468 (1815). *See generally* Kris W. Kobach, *The Origins of Regulatory Takings: Setting the Record Straight*, 1996 Utah L. Rev. 1211, 1234–45 (discussing *Gardner, Cooper*, and other riparian cases).

Or consider *Patterson v. City of Boston*, 37 Mass. (20 Pick.) 159 (1838). There, the city widened a street. *Id.* at 163. For two years, the construction prevented a store owner from accessing his shop. *Id.* at 165. Even though the city never occupied the premises, it had to compensate the store owner. *Id.* at 164–66. As Chief Justice Lemuel Shaw recognized, the construction deprived him of his "paramount right of occupation and enjoyment." *Id.* at 164.

Intangible rights were likewise property protected from takings. The revocation of a franchise, for instance, was treated as a compensable taking "on the theory that the revocation was a seizure of intangible property." Treanor at 792 n.54; *see W. River Bridge Co. v. Dix*, 47 U.S. (6 How.) 507, 523, 533–34 (1848); *id.* at 543 (Woodbury, J., concurring); 2 James Kent, *Commentaries on American Law* 340 n.a (4th ed. 1840). Since property need not be physical, takings need not be physical either.

In short, when the government takes a property right for some governmental use, it must compensate the owner. I now turn to how that rule squares with current doctrine.

### III.  APPLYING ORIGINALISM TO MODERN REGULATORY TAKINGS

Courts must identify both a property right that has been taken and a public use into which that right has been pressed. If we look at takings that way, only the first *Penn Central* factor aligns closely with the original meaning of the Takings Clause.

*1. The character of the government's invasion*. *Penn Central* reasoned that courts should more readily find physical invasions to be takings "than when interference arises from some public program adjusting the benefits and burdens of economic life." 438 U.S. at 124. As early takings practice shows, we should read this factor to ask whether the government has taken a property right from the "collection of individual rights" that "constitute property." *United States v. Craft*, 535 U.S. 274, 278 (2002).

To define each right, we look to state property law. Classically, the central right is the right to exclude others. *See* 2 Blackstone *2; *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979). Another is the right to occupy your property. 2 Blackstone *8, *10. Current per se takings doctrine properly secures these rights. *See Cedar Point*, 141 S. Ct. at 2073–74.

But these are not the only property rights. Property law historically includes the rights to dig or mine below the land and to keep others from building into the airspace above it. 2 Blackstone *18. It also includes the rights to graze, to fish, and to draw water. *Id.* at *32–36. There is the right to pass property on to one's heirs. *Id.* at *11; *see Hodel v. Irving*, 481 U.S. 704, 716 (1987). And there are easements, like rights of way and access to light and air. Restatement (Third) of Property

(Servitudes) § 1.2; J.A. Robinson, *Implied Easements of Light and Air*, 4 Yale L.J. 190 (1895).

If the state deprives property owners of one of these rights, it may commit a taking. Existing doctrine hints as much. For example, the government may not ban all economically valuable use without paying compensation. *Lucas*, 505 U.S. at 1019. Nor can it ban bequests and devises to one's heirs. *Hodel*, 481 U.S. at 716–18. Nor may it demand a right of way over private property without paying for the easement. *Nollan v. Calif. Coastal Comm'n*, 483 U.S. 825, 827, 841–42 (1987). It can regulate coal mining without paying compensation, but it may well have to pay if it bans mining entirely (at least if it does so for a public use). *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 268–72, 295–97 (1981); *Pa. Coal Co.*, 260 U.S. at 412–13 (holding that a ban on coal mining below homes to prevent their collapse is a taking).

Here, Jersey City's regulation did not *take over* the owners' right to rent. Indeed, they could still lease out their property as long as they followed the duration limits. And maintaining those use restrictions is within the state's ordinary police power. *See, e.g.*, *Sobel v. Higgins*, 590 N.Y.S.2d 883, 884 (N.Y. App. Div. 1992) ("The regulation of rental housing … has long been upheld … as a valid exercise of the government's police power to protect the public health, safety, and general welfare.").

Of course, not all burdens on these rights amount to takings. *See, e.g.*, *Penn Central*, 438 U.S. at 124–27. To draw the line between impermissible deprivations and permissible regulation, we should look to the historical common law. *Cf. Bruen*,

11

142 S. Ct. at 2127 (courts may assess the scope of rights by examining the "historical tradition that delimits the outer bounds of the right"). Historically, states have been able to regulate "for the protection of the health, morals, and safety of the people" without "directly encroaching upon private property." *Mugler v. Kansas*, 123 U.S. 623, 668 (1887). Indeed, as far back as the Founding, states have forbidden nuisances and imposed regulatory burdens on land use that stop short of confiscating property rights. *See generally* John F. Hart, *Land Use Law in the Early Republic and the Original Meaning of the Takings Clause*, 94 Nw. U. L. Rev. 1099 (2000).

*2. Economic impact & investment-backed expectations.* Though the first *Penn Central* factor fits with the original understanding of the Takings Clause, the rest of the test is hard to square with the Constitution's text and history. The second and third factors look to "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation had interfered with distinct investment-backed expectations." *Penn Cent.*, 438 U.S. at 124. These expectations must be more than mere hopes or mental plans. *See id.* at 130. But *Penn Central* stopped short of tying those expectations to actual property rights.

Yet it is hard to see how merely diminishing something's value amounts to taking property. An owner has no right to have his property hold a specific economic value. Its value often fluctuates with the market or the neighborhood. Indeed, current precedent already recognizes as much. *See Lucas*, 505 U.S. at 1016 n.7 (leaving open whether a 90% diminution in value would suffice).

12

Similarly, the *Penn Central* test fails to ground "investment-backed expectations" in an owner's recognized property rights. This is not to say that property owners do not enjoy any protections. If the expectation arises from a contract with the government, then the owner can pursue contract remedies. *See, e.g.*, 41 U.S.C. §§ 7101–09. Plus, the Contracts Clause prevents states from "impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. That bar applies to contracts with a state as well as those between private parties. *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 137 (1810); *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 652, 664, 712 (1819). Thus, states may not defeat the "reasonable expectations" of a party to a contract. *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018). The investors here never explain how the short-term rental policy harms a "*contractual* relationship." *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union v. Virgin Islands*, 842 F.3d 201, 210 (3d Cir. 2016) (emphasis added). So they have no contractual claim. But the Contracts Clause, not the Takings Clause, provides a better guide for analysis here.

\* \* \* \* \*

We properly reject the investors' takings claim today, but only after applying a fuzzy test. The Takings Clause's text and history focus cleanly on whether a state has taken a property right and pressed it into public use. Of course, the Supreme Court's precedent binds us. But if the Court reconsiders, going back to the Clause's text and historical understanding will provide not only a surer constitutional footing but also needed clarity.

13