NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2767-21

ENGLEWOOD HOSPITAL &
MEDICAL CENTER, HUDSON
HOSPITAL OPCO, LLC, d/b/a
CHRIST HOSPITAL, IJKG OPCO,
LLC, d/b/a BAYONNE MEDICAL
CENTER, HUMC OPCO, LLC,
d/b/a HOBOKEN UNIVERSITY
MEDICAL CENTER, CAPITAL
HEALTH REGIONAL MEDICAL
CENTER, CAPITAL HEALTH
MEDICAL CENTER – HOPEWELL,
COOPER UNIVERSITY HOSPITAL,
HACKENSACK MERIDIAN
HEALTH PASCAK VALLEY
MEDICAL CENTER, JFK
MEDICAL CENTER, OUR LADY
OF LOURDES MEDICAL CENTER,
LOURDES MEDICAL CENTER OF
BURLINGTON COUNTY,
ST. FRANCIS MEDICAL CENTER,
HACKENSACK MERIDIAN
HEALTH – MOUNTAINSIDE
MEDICAL CENTER, and PRIME
HEALTHCARE SERVICES –
ST. MARY'S PASSAIC, LLC, d/b/a
ST. MARY'S GENERAL HOSPITAL,

     Plaintiffs-Appellants,

v.

THE STATE OF NEW JERSEY,
THE STATE OF NEW JERSEY

> **APPROVED FOR PUBLICATION**
>
> **June 27, 2024**
>
> **APPELLATE DIVISION**

DEPARTMENT OF HUMAN SERVICES, SARAH ADELMAN in her capacity as Commissioner of the DEPARTMENT OF HUMAN SERVICES, STATE OF NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES, MEGHAN DAVEY, in her capacity as Director of the DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES, STATE OF NEW JERSEY DEPARTMENT OF HEALTH, and DR. KAITLAN BASTON, in her capacity as Commissioner of the DEPARTMENT OF HEALTH,

      Defendants-Respondents.

_____

Argued October 31, 2023 – Decided June 27, 2024

Before Judges Rose, Smith and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket Nos. L-1434-17 and L-1397-18.

John Zen Jackson argued the cause for appellants (Greenbaum, Rowe, Smith & Davis, LLP, attorneys; James A. Robertson IV, John Zen Jackson, Andrew F. McBride, Robert B. Hille, and Paul L. Croce, on the briefs).

Jacqueline D'Alessandro, Deputy Attorney General, argued the cause for respondents (Matthew J. Platkin, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Jacqueline

D'Alessandro and Elizabeth Tingley, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

SMITH, J.A.D.

After cross-motions for summary judgment, plaintiffs appeal from the trial court's order granting defendants' motion for summary judgment on certain taking claims and dismissing certain plaintiffs' remaining takings claims on ripeness grounds for failure to exhaust administrative remedies.

Plaintiffs, a group of hospitals licensed to do business in New Jersey and governed by the Health Care Cost Reduction Act, N.J.S.A. 26:2H-18.50 to -69, contend that N.J.S.A. 26:2H-18.64 (charity care), the State's Medicaid Plan, and corresponding regulations compel plaintiffs to use medicine, equipment, and services they control to provide patient care regardless of ability to pay, and without an adequate subsidy to make up the financial shortfall. Plaintiffs argue that this scheme represents an unconstitutional taking. Plaintiffs also claim the trial court erred when it dismissed certain plaintiffs' claims for a lack of ripeness due to their failure to exhaust administrative remedies.[1]

---

[1] See Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001) (permitting an appellate court to affirm for other reasons because "appeals are taken from orders and judgments and not from opinions").

Considering the arguments and governing legal principles, we affirm the trial court's order dismissing all of the constitutional taking claims, but we do so for slightly different reasons.

I.

A.

A brief overview of Medicaid, the Health Care Cost Reduction Act, and related charity care provisions is warranted. The Medicaid program, established in 1965 by Title XIX of the Social Security Act, is a joint federal-state program designed to provide medical care for indigent, disabled, and elderly persons. 42 U.S.C.A. § 1396; United Hosps. Med. Ctr. v. State, 349 N.J. Super. 1, 4 (App. Div. 2002). If a state chooses to join the Medicaid program, it "must operate its program in compliance with the federal statute and regulations," United Hosps., 349 N.J. Super. at 4 (citing Harris v. McCrae, 448 U.S. 297, 301 (1980)), and must submit a Medicaid State Plan, describing the methods and standards for reimbursement to providers, for federal approval, 42 U.S.C.A. § 1396(a)(13); N.J.S.A. 30:4D-7.

In 1968, our State Legislature elected to participate in the Medicaid program when it passed the Medical Assistance and Health Services Act (N.J.S.A. 30:4D-1 to -19) for patients whose "resources are determined to be inadequate to secure necessary medical care at their own expense." Bergen

Pines County Hosp. v. N.J. Dep't of Human Servs., 96 N.J. 456, 465 (1984). As per the Act, the Medicaid program is administered by the Division of Medical Assistance and Health Services (the Division). See United Hosps., 349 N.J. Super. at 5.[2]

In 1992, as part of the Health Care Cost Reduction Act, N.J.S.A. 26:2H-18.50 to -69, the Legislature enacted N.J.S.A. 26:2H-18.64, which provides in part, "[n]o hospital shall deny any admission or appropriate service to a patient on the basis of that patient's ability to pay or source of payment." Such care is referred to as charity care.[3] To qualify for charity care, individuals must have no health coverage, private or government sponsored (including Medicaid), and meet the income and asset eligibility requirements. N.J.A.C. 10:52-11.8. A hospital which violates the statute is subject to a fine of $10,000 per violation.[4] See N.J.S.A. 26:2H-18.64.

---

[2] Providers are reimbursed for care of Medicaid-eligible patients through the N.J. Medicaid Program fund, and the State is permitted to seek reimbursement for a portion of those costs. See SSI Med. Servcs v. State of New Jersey, 146 N.J. 614, 617-18 (1996).

[3] Charity care is one aspect of New Jersey's Medicaid State Plan, which is approved by the Secretary of Health and Human Services. See N.J.S.A. 30:4D-6.

[4] The corresponding regulation is N.J.A.C. 10:52-11.14, which prohibits hospitals from sending a bill for services to eligible persons or initiating collection actions against them.

A-2767-21

The Legislature recognized that disproportionate share hospitals (DSH)[5] bear a greater burden to sustain the interests of the Health Care Cost Reduction Act and established a Health Care Subsidy Fund (HCSF), N.J.S.A. 26:2H-18.58, to distribute subsidies to qualifying facilities. Each year, the Legislature appropriates funds to the HCSF via the annual Appropriations Act. The State of New Jersey Department of Health (DOH) then allocates subsidies for the current state fiscal year according to the statutory formula contained in N.J.S.A. 26:2H-18.59i—accounting for any instructions or modifications contained in the current year's Appropriations Act. N.J.S.A. 26:2H-18.55.

In Univ. of Med. & Dentistry v. Grant, we explained the subsidy program's operation in detail:

> The statutory distribution formula requires a determination of how much charity care an eligible hospital has provided, valued not at its usual and customary charges but rather on the amount Medicaid would pay for such services ("documented charity care").
>
> . . . .
>
> Therefore, the initial value must be converted or "priced" to the Medicaid value to determine ultimately

_____

[5] A hospital qualifies as a DSH when it serves a disproportionate number of low-income patients with special needs.

the "documented charity care" for each eligible hospital.

. . . .

To this basic figure, other calculations are applied to determine eligibility for, and amount of, any subsidy. The "profitability factor" reduces the hospital's "documented charity care" if the hospital's operating margin is above the statewide median. Also considered is the "payer mix factor," determined by how much of the hospital revenues come from private payers. A hospital with a factor equal to or less than the statewide target would not receive a charity care subsidy.

[343 N.J Super. 162, 165-68 (App. Div. 2001) (internal citations omitted).]

The Legislature's health care subsidy is not designed to be a full "reimbursement" covering a hospital's actual charity care expenses, but instead to provide each hospital with its "proportionate share of the total subsidy funded by the Legislature for that year." Id. at 165. Hospitals may challenge their assigned share of the HCSF in two ways. They may challenge the amount of their designated HCSF subsidy by filing an administrative appeal with the DOH. N.J.A.C. 10:52-13.4(f)(1)-(2). They may also seek an adjustment of the Medicaid rate issued each year by the Division. N.J.A.C. 10:52-14.17(c)(1).

B.

7

Against this backdrop, we review our unpublished opinions in In re Medicaid Inpatient Hosp. Reimbursement Rate Appeals (In re Medicaid), No. A-3726-13 (App. Div. May 20, 2016) and IMO Englewood Med. Ctr.'s SFY 2014 Charity Care Subsidy Appeal (IMO Englewood), No. A-1555-13 (App. Div. May 20, 2016), which are directly related to the matter before us.[6] In each case, the plaintiff hospitals raised taking claims as part of their rate challenges, and in each case final administrative decisions were issued dismissing the taking claims on jurisdictional grounds.

In In re Medicaid, plaintiff hospitals appealed to the Division disputing their assigned Medicaid rates pursuant to N.J.A.C. 10:52–14.17. (slip op. at 2-3). After the Division denied the appeals, plaintiffs sought an administrative hearing to make an as-applied constitutional challenge to each [h]ospital's 2009 Medicaid rates. Id. at 4. They argued the State failed to provide adequate compensation for its taking of [h]ospital property, "including . . . facilities, equipment, staff and services, for public use." Ibid. In its final administrative decision, the Director of the Division concluded that an

_____

[6] References and citations to these unpublished appellate opinions herein are provided for the purpose of explaining the history of the hospitals' efforts to bring constitutional takings claims, and as such are not provided for any precedential purpose. See Zahl v. Hiram Eastland, Jr., 465 N.J. Super. 79, 86 n.1 (App. Div. 2020) ("Although citing an unpublished opinion is generally forbidden, [see R. 1:36-3], we do so here to provide a full understanding of the issues presented.").

A-2767-21

administrative hearing was not the proper venue for the hospitals' "facial challenge to the charity care statute . . . administered by the [DOH] not [the Division]." Ibid. We affirmed, concluding the hospitals' takings claims were not foreclosed, and could "be developed and . . . adjudicated in another forum." Id. at 17.

In IMO Englewood, eight hospitals filed administrative appeals challenging the New Jersey Health Care Cost Reduction Act, including N.J.S.A. 26:2H-18.64. (slip op. at 3). The plaintiffs projected losses for fiscal year 2015, alleging the losses were due to their statutory obligation to provide low or no-cost care to eligible persons. Id. at 5-6. The plaintiffs claimed this statutory obligation, combined with the alleged inadequate subsidies, constituted unconstitutional takings of their property without just compensation. Id. at 6. The Commissioner of the DOH concluded it lacked jurisdiction to consider the hospitals' constitutional claims. Ibid. We affirmed. Id. at 3. Noting the plaintiff hospitals received some subsidies in the disputed years, we declined to exercise original jurisdiction because of an insufficient factual record. Id. at 8-9, 14. Similar to In re Medicaid, we instructed the plaintiff hospitals to bring their claims in the trial court, where a

factual record appropriate to analyze their takings claims could be developed. Id. at 15.[7]

## II.

We turn to the matter before us. Plaintiffs are fourteen licensed for-profit and non-profit general acute care hospitals who all qualify as DSH.[8] Defendants include the State of New Jersey, the State of New Jersey Department of Human Services (DHS), the Division, DOH, and several state officials.[9]

Approximately six weeks after our decisions in In re Medicaid and IMO Englewood, plaintiffs filed suit against various state entities and individual

---

[7] In both In re Medicaid and IMO Englewood, the plaintiff hospitals brought as-applied constitutional challenges, however, in both cases, the Director and Commissioner considered the challenges as facial. For example, the Commissioner in IMO Englewood noted the hospitals had not challenged the manner in which their charity care subsides had been calculated, but rather their statutory obligation to provided charity care in light of inadequate subsidies. Id. at 6.

[8] After argument, JFK Medical Center was dismissed pursuant to stipulation on February 27, 2024.

[9] Sarah Adelman is the current commissioner of DHS. Jennifer Langer Jacobs is the current Division Assistant Commissioner of the Division. As the Division is part of the Department of Human Services, respondents Commissioner Adelman, DHS, Assistant Commissioner Jacobs, and the Division are referenced collectively in this memo as "the Division." In addition, the current commissioner of the DOH is Dr. Kaitlan Baston as of July 25, 2023. All defendants are collectively referenced to herein as "the State."

officers, asserting constitutional takings claims dating back to 2004. Plaintiffs' two-count complaint alleged that under the Fifth and Fourteenth Amendments of the United States Constitution as well as Article I, Paragraph 20 of the New Jersey Constitution of 1947: "The obligations imposed by the [charity care] [s]tatute result in a taking of the . . . [h]ospitals' real and personal property in terms of space, supplies, and services"; and "[T]he mandates imposed on the . . . [h]ospitals by . . . [the charity care] [s]tatute along with the limited reimbursement provided by the Division and DOH for the . . . hospitals' treatment of Medicaid and charity care patients has resulted in an as-applied violation of the Takings Clauses of the United States and New Jersey Constitutions."

After the close of discovery, both sides moved for summary judgment. Finding no disputed issues of material fact, the court granted defendants' motion for summary judgment on certain taking claims, and dismissed in part plaintiffs' remaining takings claims on ripeness grounds for failure to exhaust administrative remedies.

The court first considered the question of whether plaintiffs' claims constituted as-applied or facial constitutional challenges. The court found each plaintiff sought just compensation for their individual alleged shortfalls and did not seek to advocate for the rights of hospitals statewide. Hence, the

11

court concluded plaintiffs' claims were as-applied constitutional takings claims.

The court's comprehensive statement of reasons supporting its order granting defendants summary judgment included findings of fact and conclusions of law. First, the court concluded certain plaintiffs' claims were not ripe, finding they failed to exhaust administrative remedies prior to filing suit. Next, the court analyzed the surviving plaintiffs' claims and concluded New Jersey's charity care statute and the Medicaid rates used for the HCSF distribution formula did not constitute a physical or regulatory taking. The court stated:

> [A]ny interference with [p]laintiffs' property rights arises from two public programs enacted to adjust the burdens and benefits of economic life for the common good. The charity care and Medicaid programs ensure equal access to healthcare for indigent patients—a public health and healthcare purpose squarely in line with the public health laws upheld in In re Health Care Admin. Bd., 83 N.J. 67, 73, 75-76 (1980), and Cooper Medical Center v. City of Camden, 214 N.J. Super. 493, 496-97 (App. Div. 1987).
>
> [(Citations reformatted).]

Plaintiffs appealed.

### III.

Our review of a trial court's summary judgment order is de novo, applying the same legal standard, namely, the standard set forth in Rule 4:46-

12

2. Conley v. Guerrero, 228 N.J. 339, 346 (2017).  We consider, as did the trial court, whether "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party."  Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)).

If there is no genuine issue of material fact, we must then "decide whether the trial court correctly interpreted the law."  Dickson v. Cmty. Bus Lines, 458 N.J. Super. 522, 530 (App. Div. 2019) (citing Prudential Prop. & Cas. Co. v. Boylan, 307 N.J. Super. 162, 167 (App. Div. 1998)).  "We accord no deference to the trial judge's conclusions of law and review these issues de novo."  Ibid.

Both the Takings Clause of the Fifth Amendment and the New Jersey Constitution prohibit the taking of private property for public use "without just compensation."  U.S. Const. amend. V; N.J. Const. art. I, ¶ 20.  Our courts apply the same analysis for state and federal takings claims, viewing the constitutional provisions as "coextensive."  Klumpp v. Borough of Avalon, 202 N.J. 390, 405 (2010).

While "[t]he paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property," the

Constitution also guards against certain uncompensated regulatory interference with a property owner's interest in their property. Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537-38 (2005); see also Cedar Point Nursery v. Hassid, 594 U.S. 139, 147-48 (2021) (noting most obvious examples of physical takings include when government condemns property, takes possession without acquiring title, or physically occupies property—such as "recurring flooding as a result of building a dam"). Regulations are considered per se takings where they "result[] in a physical appropriation of property." Cedar Point, 594 U.S. at 149.

Where the regulation does not occupy or appropriate property, but still influences it, we must engage in a fact-specific inquiry. See Ark. Game & Fish Comm'n v. United States, 568 U.S. 23, 32 (2012); Bernardsville Quarry, Inc. v. Borough of Bernardsville, 129 N.J. 221, 232 (1992). In Penn Central, 438 U.S. 104, 124 (1978), the Supreme Court identified certain factors to guide such a fact-sensitive analysis, observing there is no "set formula" for deciding regulatory takings cases. The three Penn Central factors are: the economic impact of the regulation on plaintiff; the extent to which the regulation has interfered with plaintiff's investment-backed expectations; and the character of the governmental action being challenged. Ibid.; see also Mansoldo v. State, 187 N.J. 50, 58-59 (2006) (explaining "protection from

governmental takings under the New Jersey constitution is coextensive with protection under the federal constitution" and that the Penn Central factors serve to resolve regulatory takings claims that are not per se physical takings).

A.

We first consider whether the trial court erred by dismissing some of plaintiffs' claims for failure to exhaust administrative remedies.

The court found plaintiffs' taking claims were as-applied claims. Having carefully reviewed the record, we reach a different conclusion. An as-applied constitutional challenge to a regulatory scheme necessarily involves the proffer of evidence to support the challenge. The administrative agency responsible for enforcement of the regulation must hear the claim first. See Fred Depkin & Son, Inc. v. Dir., New Jersey Div. of Tax'n, 114 N.J. Super. 279, 284-86 (App. Div. 1971). This principle does not apply to facial claims, which are purely questions of law. Ibid. see also Matter of Comm'r of Ins.'s Issuance of Ords. A-92-189 & A-92-212, 274 N.J. Super. 385, 404 (App. Div. 1993).

Here, plaintiff hospitals challenge the Legislature's reimbursement system, including N.J.S.A. 26:2H-18.64, in its entirety. If successful, plaintiffs would have us declare charity care unconstitutional for failing to provide plaintiffs at-cost reimbursement. The charity care subsidy reimburses no hospital in New Jersey at one hundred percent. It follows that plaintiffs'

15

claim is one which, if successful, will affect all hospitals, even though the claim was not brought on behalf of all hospitals licensed to operate in the state. We conclude this represents a facial constitutional attack on the charity care statute, and that it would be futile to remand those claims to the agency.[10] We conclude that the trial court's order dismissing without prejudice certain plaintiffs' takings complaints between 2004 and 2015 for failure to first obtain individual decisions under the rate appeal process was issued in error.[11]

B.

Plaintiffs' primary argument on appeal is that the trial court erred by concluding no taking occurred. They propose alternate theories. First, plaintiffs posit N.J.S.A. 26:2H-18.64's operation results in a per se taking of

---

[10] Even if we accept that plaintiffs' constitutional claims were as-applied and not facial claims, a ripeness analysis would require judicial review of all the takings claims now. See Platkin v. Smith & Wesson, 474 N.J. Super. 476, 496 (App. Div. 2023). Plaintiffs have spent years attempting to bring constitutional taking claims as part of their administrative challenge to Medicaid rates and charity care subsidies. It follows that remand for an administrative hearing on any aspect of these claims after more than a decade of litigation would be fundamentally unfair.

[11] The trial court dismissed without prejudice all takings claims for lack of ripeness except the following: Englewood Hospital & Medical Center and JFK Medical Center for fiscal years 2009-12 and 2014-15; Hoboken University Medical Center, Capital Health Regional Medical Center, and Capital Health Medical Center–Hopewell for fiscal years 2014-15 only; and Hackensack Meridian Health Pascack Valley Medical Center, Hackensack Meridian Health Mountainside Medical Center, and St. Mary's General Hospital for fiscal years 2009-12 only.

16

hospital property due to the "inadequate" state subsidies the statute generates. In the alternative, plaintiffs contend they met their burden to show a regulatory taking of the same property occurred when they presented to the trial court uncontroverted Penn Central evidence.

A constitutional takings analysis must first address the nature of the property at issue. Property need not be physical, tangible property to trigger a takings analysis. The term property

> is not used in the "vulgar and untechnical sense of the physical thing . . . . [Instead, it] [denotes] the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it. . . . The constitutional provision is addressed to every sort of interest the citizen may possess."
>
> [Pruneyard Shopping Ctr. v. Robins, 447 U.S. 74, 82 n.6 (1980) (second, third, and fourth alterations in original) (quoting United States v. General Motors Corp., 323 U.S. 373, 377-78 (1945)).]

The United States Supreme Court has identified property interests in both real property and in investment interests. See, e.g., Horne v. Dep't of Agric., 576 U.S. 350 (2015) (finding property interest in raisins confiscated by government officials); Duquesne Light Co. v. Barasch, 488 U.S. 299, 309-12 (1989) (finding property interest in utility profits where rates were so stringent that they became confiscatory in nature). Our Supreme Court has also identified property interests in a landlord's expectation of rental income and

17

the rendering of professional services. See, e.g., Prop. Owners Ass'n v. North Bergen, 74 N.J. 327, 336 (1977) (finding rental subsidies confiscatory); Madden v. Delran, 126 N.J. 591, 602 (1992) (identifying legal services as property).

We now consider plaintiffs' contention that operation of N.J.S.A. 26:2H-18.64 results in a physical appropriation of their property, which effects a per se taking. Plaintiffs argue government-authorized entry onto their property and compelled provision of medical supplies and staff labor goes further than just a "regulatory restriction on use." They rely primarily on the standard set forth in Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982), which was further developed by Nollan v. California Coastal Com'n, 483 U.S. 825 (1987).

In Loretto, New York passed a law requiring landlords to permit cable companies to install equipment on apartment buildings in exchange for a nominal fee. 458 U.S. at 421. The Supreme Court held that where a physical occupation is permanent—no matter how small—it is a taking that must be compensated. Id. at 435.

In Nollan, the Supreme Court applied Loretto where a government land use entity conditioned a use permit upon the property owner's grant of a public easement. 483 U.S. at 827. The Court concluded the easement was a

18

"permanent physical occupation" of the property, because the public was "given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises." Id. at 832.

In contrast to the plaintiffs in Loretto and Nollan, plaintiffs here operate hospitals within the complex and highly regulated health care industry. Unlike the cable installation law in Loretto, N.J.S.A. 26:2H-18.64 does not limit the right to exclude individuals from their premises. Rather, it prohibits hospitals from turning away patients "on the basis of [their] ability to pay" without being subject to civil penalty, and further prohibits billing only those patients who qualify under charity care. Similarly, the contested scheme does not permit the public's unfettered access to plaintiffs' premises like the easement condition in Nollan. Instead, the Legislature crafted the charity care statute with specificity, requiring plaintiffs provide care only to those the act aims to benefit.

To further support their argument, plaintiffs contend their facts are analogous to the facts in Cedar Point, and distinguishable from Pruneyard Shopping Ctr., 447 U.S. at 74 (holding that the temporary occupation of a privately owned mall by pamphleteers was not a taking).

19

In Cedar Point, the Supreme Court concluded a regulation granting labor union organizers a three-hour right of access to agricultural employer's property 120 days a year, for the purpose of soliciting support for unionization was a per se physical taking. 549 U.S. at 143. The nature of the property at issue was a private agricultural business—not open to the public. The disputed regulation required the plaintiff property owners to open their property to third-party union organizers. The plaintiffs claimed the imposition disturbed their operations. Ibid. The Court pointed out that Pruneyard was "readily distinguishable," as it involved a business generally open to the public unlike the farms at issue. Id. at 157.

We conclude the charity care statute's operation does not lead to physical invasion of the hospitals' property by the public because, unlike Cedar Point, the public's presence in a hospital is a natural element of its business, making it more analogous to Pruneyard. Although plaintiffs contend that charity care as a whole has a negative economic impact on their investment interests, there is no evidence that the prohibition on turning away patients because of inability to pay unreasonably impairs the value of the premises. Charity care restricts how hospitals use their property to provide medical services, not whether they do so. The property will be used as it was intended—to treat patients.

20

Finally, the hospitals' argument that the charity care provisions' requirements are an unconstitutional appropriation of their tangible personal property is without merit. To support their argument, plaintiffs cite the standard provided by Horne, 576 U.S. at 355 (holding a law requiring raisin growers "to give a percentage of their crop to the government, free of charge," was a per se taking). However, unlike Horne, the statute here does not require a transfer of ownership of medical supplies or equipment into the government's or a third party's hands. The hospitals retain the majority of their agency as to their medical supplies and equipment. The record shows no per se taking, as plaintiffs have failed to show evidence of physical appropriation of the hospital property, real or personal, consistent with our jurisprudence.

C.

Having found no per se taking, we next balance "the private interests affected by the regulation against the public interests that are advanced." Matter of Plan for Orderly Withdrawal of Twin City Fire Ins. Co., 129 N.J. 389, 417 (1992). To accomplish this, we analyze the relationships among the Penn Central factors. Where there is no per se taking, and

> where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner

21

to bear a burden that should be borne by the public as a whole.

[Yee v. City of Escondido, 503 U.S. 519, 522-23 (1992).]

Plaintiffs argue the uncontroverted record shows: adverse economic impact to the hospitals; undue infringement on their investment backed expectations; and per se confiscatory government action. They contend that, on balance, N.J.S.A. 26:2H-18.64's regulatory burden outweighs its public good. We discuss each factor in turn.

### 1. Economic Impact

Plaintiffs argue the subsidy shortfall causes a constitutionally burdensome economic impact. They offer expert testimony to show their hospitals fall below the national median in three main industry-wide criteria: profitability, liquidity, and debt-to-capitalization ratio.

A regulation's economic impact must be examined in the context of the property as a whole rather than by its parts or segmented uses. See Penn Central, 438 U.S. at 130-31. We look to the disparity between subsidies plaintiffs received and the cost they've incurred for charity care medical services and determine the impact it has had on their property. Giving all favorable inferences to plaintiffs, Kearny, 214 N.J. at 91, the record shows they clearly established before the court evidence sufficient to support a

finding that N.J.S.A. 26:2H-18.64 has had an adverse impact on their profitability. The record also shows that during the years of plaintiffs' compliance with N.J.S.A. 26:2H-18.64, they fell short of industry-wide profitability standards. Plaintiffs further contend that shortfall is wholly due to the charity care provisions. While plaintiffs have shown sufficient material issues of fact demonstrating they are less profitable than the average hospital nationally, they have not shown that N.J.S.A. 26:2H-18.64 deprives them of economic use of their properties as a whole, in effect, as hospitals. See Yee, 503 U.S. at 522-23. A takings claim cannot be sustained on the sole ground that plaintiffs fail to financially perform on par with industry-wide norms. This framing fails to recognize other relevant regulatory factors at work which may be unique to a given hospital serving the community where it is located. See Hutton Park Gardens v. Town Council of Town of W. Orange, 68 N.J. 543, 570 (1975) ("The rate of return permitted need not be as high as prevailed in the industry prior to regulation nor as much as an investor might obtain by placing his capital elsewhere."). Giving all favorable inferences that this factor should weigh moderately in favor of finding a taking of plaintiffs' property, but we caution that this one factor is not dispositive.

2. Interference with Investment-Backed Expectations

Plaintiffs claim that the charity care statute unduly interferes with their investment-backed expectations. Here, the pertinent question is whether plaintiffs have a reasonable investment-backed expectation in receiving reimbursement at cost for their treatment of charity care patients. "[D]istinct, investment-backed expectations are reasonable only if they take into account the power of the state to regulate in the public interest." Nekrilov v. City of Jersey City, 45 F. 4th 662, 674-75 (3d Cir. 2022) (alteration in original) (quoting Pace Resources, Inc. v. Shrewsbury Twp., 808 F. 2d 1023, 1033 (3d Cir. 1987)). Hospital investors in the highly regulated health care industry should expect that use of their property, in all its forms, is likely to be regulated by the state, and that such government regulation may diminish investment-backed expectations without resulting in an unconstitutional taking. See also United Wire, Metal & Mach. Health & Welfare Fund v. Morristown Mem'l Hosp., 995 F. 2d 1179, 1191 (3d Cir. 1993) (rejecting a takings challenge to state system of setting hospital billing rates, in part, because plaintiffs' investment-backed expectations were reduced by "the historically heavy and constant regulation of health care" in the state).

The New Jersey health care industry has been consistently and comprehensively regulated within our state. Plaintiffs, as a condition of obtaining their hospital licenses, elected to provide subsidized medical

services in the communities they serve. When a hospital seeks a license to operate in our state, it must consider the laws in effect at that time as well as those which may be adopted by our Legislature. Given plaintiffs' choice to do business here, it is reasonable that they should expect such license conditions to affect business profits. In turn, we conclude it is not reasonable for the hospitals to expect an at-cost reimbursement for the medical services the Legislature has required them to provide as a condition of doing business in our state. Plaintiffs have failed to satisfy this Penn Central factor.

### 3. Character of the Government Action

Our courts have repeatedly stated that the character of public health and healthcare regulations typically weighs against the conclusion that a law acts as a taking. See JWC Fitness, LLC v. Murphy, 469 N.J. Super 414, 436 (2021) (recognizing the nature of the regulation weighed against finding a taking as it was not specific to plaintiff and was a valid exercise of police power); In re Health Care Admin. Bd., 83 N.J. at 81 (finding no taking where the "regulations in question are directed at an acute social problem affecting the health and welfare of the needy aged and infirm, are well within the power and authority vested in the [DOH] by the Legislature").

The requirements of the charity care statute and its subsidy scheme are specific to its aims—to ensure equal access to healthcare for indigent patients,

and we conclude that such regulation fits squarely within the police power vested in our Legislature. The Legislature, in turn, has delegated authority to the respective agencies to oversee the appeal processes for both Medicaid reimbursement rates and the charity care subsidy. To this end, the character of the government action reflects a reasonable adjustment to the benefits and burdens of economic life for the common good and weighs strongly against finding a taking.

D.

After a thorough review of all plaintiffs' constitutional taking claims, we conclude that the record shows no per se taking, nor does a balancing of the Penn Central factors reveal a regulatory taking. We affirm the trial court's order granting defendants' motion for summary judgment against all plaintiffs.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office

CLERK OF THE APPELLATE DIVISION